Judge Marshall
delivered the Opinion of the Court.
In June, 1832, William Hause and Son, Merchants of Philadelphia, packed and forwarded, under an order from S. P. Judson of Saint Louis, Missouri, twenty-six packages of goods, in as many trunks and boxes, which they sent, by the way of Baltimore, each marked as follows: “S. P. Judson, St. Louis, Mo.—care of E. L. Eichelberger, Balt,—from Wm. Hause & Son, Phila.” The packages, thus addressed and forwarded, passed to and down the Ohio river, on their way towards Saint Louis, until they arrived at Louisville; where, together with other goods also on their way to the same consignee, they were stopped in the hands of William G. Bakewell, by an attachment in Chancery, issued in July, 1832, at the suit of Anderson & Atterbury, who prayed that they might be subjected to the satisfaction of their debt, claimed in the bill, on the ground that they were the property of Judson, an absent debtor. Three other *8 creditor's followed immediately with attachment bills containing similar prayers, each succeeding bill referring to those which had been previously filed and yielding precedency to the claims therein set up. On these bills a general order was made by the Chancellor, dil’ecting Bakewell to sell the goods of Judson in his hands, make report of the sales, and hold the proceeds (after deducting charges and his own claim against Judson) subject to the further order of the Court.
In this state of things, Hause and Son, in November, 1832, filed their bill against Judson, Bakewell, Anderson & Atterbury and the other attaching creditors. They state, substantially-, the foregoing facts, describe the kind and value of the goods contained in the twenty-six packages, and allege that no part of the price had been paid; that Judson was a resident of Saint Louis, but had gone off to Texas; that he was insolvent, and that the goods had never come to his hands, directly or indirectly. In consequence of these facts, and by virtue of their alleged right of stoppage in transitu, they claim the goods in the twenty-six packages as their own; and they allege, that they had so claimed them from Bakewell, but that he had sold a part, and was proceeding to sell the rest of them under the order of the Chancellor, without regard to their claim. They pray, in ■effect, that the proceeds of the twenty-six packages— to the continued sale of which they consent—be held for their benefit; or otherwise, that the amount already made be paid to them, and the packages unsold delivered to them, on their entering into bond &c. and they ask for an injunction and for general relief.
An injunction was granted, restraining Bakewell from paying over to the other claimants any of the proceeds •of the twenty-six packages described in the bill. An. derson and Atterbury answered; and the three attachment bills last filed having been dismissed by the complainants therein, thus leaving Hause & Son and Anderson & Atterbury the only contesting claimants; the two suits brought by these parties were consolidated and heard together, and the same decree was entered in •each case.
Creditors fi}g ail account, as pad of tiioiv bilg lit, which they give the def’t credit for certain drafts drawn On him— but which they allege, they fear and believe have not been paid: this is not a positive averment that the drafts remain unpaid, and does not, therefore, authorize a decree including that sum; if paid, that fact should be shown by amendment.
*9 The answer of Anderson and Atterbury is little more 'tiian a denial of any knowledge of the fact, that the complainants were the vendors of the goods, and an implied averment that the twenty-sis packages came to the hands of E. L. Eichelberger at Baltimore, and of them» selves at Wheeling, as the agents of Judson, and not of the complainants. Neither Bakewell nor Judson filed any answer to this bill, and the only evidence in the cause, is a deposition proving the packing and forwarding of the goods, and their kind and value, as stated in the bill: from which it appears that the demand of Hause and Son against Judson, on account of these goods, is twelve hundred and ninety-eight dollars.
The claim «et up by Anderson and Atterbury in their bill, is an account for goods sold and for charges paid for forwarding goods, amounting to $3,225 98 cents, “unless Judson had paid their two drafts amounting to $925 48 cents, which they say they fear and believe he has not paid, although they are credited in the account filed, under the supposition that they would be paid.” With these credits the balance due on the account is $2270 50 cents. The drafts were due and payable some weeks before the bill was filed, and .there is no further allegation or proof in relation to them. Nop did any of the defendents answer.
It does not appear that Bakewell ever made any .report of sales, as directed by the order of the Chancellor; but a short time before the hearing, an amended bill was filed on the part of Anderson and Atterbury, stating that hp had made sales and had in his hands, after paying costs and charges, more than $3000. And on the final hearing óf both suits, the Circuit Court decreed, that Bake-well, retaining his costs, should pay to Anderson and At» terbury., as due them from Judson, the whole amount of $3225 98, and that out of the remaining proceeds of th§ sales, he should pay, as far as the fund would go, the .claim of Hause and Son and their costs. For the reversal of this decree, Hause and Son prosecuted a writ of Error,
If the decree were correct in giving precedence to the ifiaim of Nfidersop and Atterbury, wp shpuld think it *10 erroneous as regards the extent to which they are preferred. The statements of their bill do not amount to an allegation that the drafts -which are credited in their account, had not been paid; nor toa direct averment that the sum decreed was in fact due. Their apprehension that the drafts had not been paid is not equivalent to a direct averment of the fact itself; and if their ap-. prehensions had afterwards proved true, they should have stated the fact in an amended bill. As there-is no such statement, the decree upon taking the bill for confessed, should have been for the smaller sum which remained after deducting the amount of the drafts, as is done in their account filed with the bills as a statement of their claim; and to that extent only, could they be entitled to the preference as against Hause and Son.
ÉLigíit of stoppage in transitu defined and explained..
But we are of opinion, that the decree is subject to the more radical objection of having improperly given precedency to the claim of Anderson and Atterbury, when, so far as relates to the goods of which Hause and Son were the vendors, their claim under the right of stoppage in transitu, was paramount.
The right of stopping goods in transitu: is defined by Chancellor Kent (2 Com. 540,) to be “the right which the vendor, when ho sells goods on credit to another, has, of resuming the possession of the goods while they are in the hands of a carrier or middleman, in their transit to the consignee or vendee, and before they arrive into his actual possession, or to the destination which has been appointed for them, upon his (the veatleo’s) be--coming bankrupt or insolvent.” It is said to be an equitable power, which, although the property is vested in the consignee by delivery to a carrier, to be transported to him, yet remains in the consignor, of resuming it, under certain circumstances, before it actually gets into the possession of the vendee. (Law of Carriers, ION) The right, though first acknowledged in Equity, is so well established at law as to be the admitted foundation of an action of trover. But it is said not to be founded upon the idea of a rescission of the contract, but to assume its continuance as in case of an equitable lien, so that it is extinguished by payment of the price,. and the *11 vendee may recover back the goods—2 Kent's Com. 541. And being a right coeval with and springing out of the very contract by which the vendee claims the goods, it is paramount to any lien of a third party against him, unless such lien arise from the necessary care, trouble or expense incurred about the goods themselves in the course of the transit. 2 Kent's Com. 550; Law of Carriers, 103; Oppenheim vs. Russell, 3. Bos. & Pull. 49.
The right of stop page in transitu cannot be defeat-en by an attach» ment at the suit of a general creditor.
Goods are sent by the vendor to a distant purqhaser, and by a route on which the mode of conveyance is occasionally changed and the goods received and forwarded by different agents, at different points: the vendor’s right of stoppage ~iu transitu, is not lost by his delivery Of the goods to the first carrier, or any subsequentagent for receiving and forwarding; but continues to tl;e end of the voyage. See next note,..
A necessary consequence of these principles, and of the established properties of the right in question is, that it cannot be superseded by an attachment at the suit of a general creditor of the vendee, levied while the goods .are in transitu. Law of Carriers, 111; Northey vs. Field, 2 Esp. R. 613; Smith vs. Goss, 1 Camp. 282. In the last of which cases Lord Ellen borough said—“The right of the consignor to stop in transitu cannot be defeated by the process of a creditor, who can have no greater right than the consignee himself. The vendor’s right of intercepting the goods is the elder and preferable lien, and eannot be superseded by the attachment.” If then the right asserted by the complainants éxisted when the goods were attached by Anderson and Atterbury, it was neither defeated nor postponed by the attachment.
Upon comparing the facts of the case with the definition which has been stated, the only point upon which the existence of the right can be questioned, is, whether the transit of the goods had determined when they were attached in the hands of Bakewell, and on this point we think there is little* room for doubt. The ground which seems to be relied on by the defendants, in contesting this point, is that the persons who had the custody of the goods at Baltimore, Wheeling and Louisville, and by whom they were forwarded on to Louisville, were the •agents of Judson; that the goods must, therefore, be considered as having come to his possession, and as being no longer in the course of transit from the vendors to him. It is, however, entirely clear from the whole case, that the persons who had possession of the goods at these several places, and those by whom they were transported from the one to the other, were in no other manner the agents of the vendee than as common car» *12 riers, receivers and forwarders: ©f goods. They" Were, in fact, but a succession of carriers or middlemen engaged in that capacity, in forwarding the transit of the goods from One intermediate stage to another on their' way from the vendors to the vendee* And there neither appears1 to have been any special agency for the vendee, nor were the goods ever under his actual control or direction, or in any manner influenced in their progress by any impulse proceeding from him. On fhe contrary, they went forward in the ordinary way, under the original impulse and direction given to them by the Vendors at Philadelphia, until they were stopped by attachment at an intermediate stage of their transit. They had not then reached their place of destination, nor conle into the actual possession or control of the vendee.
The delivery Of goócfe sold, to a carrier, vests the property, constructively, in the purchaser; but does not divest tin- v-ndor of hie-right of stoppage-in transitu, which continues as above stated: but qucre, whether, if the purchaser bakes possession of the goods on the routes—the tight will not be thereby di vested -
It is true, that by the first delivery to the carrier at Philadelphia, the goods were- constructively delivered to* the vendee* and the property thereby became- vested in him, but this constructive delivery for the purpose of’ transporting the goods to him at the distance of a thousand miles, was in fact but the beginning of the transit, ¡tad did not vest the actual possession in him. It is also true that, in some cases the transit is- determined, and indeed effected by a constructive delivery, but there are coses in which the constructive delivery places the goods within the immediate control of the -vendee* The distinction laid down by Chancellor Kent (2 Com. 545,) as one by which the cases arising on a constructive delivery may be-preconcilcd is, “that if the delivery to a carrier or agent' of the- Vendee be for the purpose of con~ veyance to the vendee, the right of stoppage continues, notwithstanding such constructive delivery to the vendee; but if the goods be delivered to the carrier or agent, far safe custody or for disposal on the part of the vendee, and the middleman is by ¡agreement converted into a special agent for the buyer, the transit or passage of the goods terminates, and with it, the right of stoppage.” The latter branch of the distinction may be elucidated by the rule or principle previously stated by the author—“that, if the goods have once fairly arrived at their destination, so as to give te the vendee the actual exercise of do*-. *13 minion or ownership over them, the right (of stoppage) is gone.” Whether the interception of the goods by the vendee before they had reached their place of destination, and the assumption of actual dominion over them by changing their destination, or otherwise, might not determine the transit, need not be decided. There was-'.no act of that sort in this case.
Where goodssub ject to the right of stoppage in', transitu, are attached, and sold under the attachment, the vendor may assert a right to the proceeds, at anytime while they remain within the control of the court where the-, attachment pending; and his demand must bo satisfied in pre ference to the attaching cradiV-
These authorities, as well as the reason of the thing, leave no question in our mind that the goods were as Certainly on their transit, and as clearly subject to be stopped by the vendors, when they came to the hands of Bakewell at Louisville, to be by him forwarded to St. Louis, and when they were attached in his hands, as F ey -were at any previous point of their progress, from the moment when they were delivered out of the hands of the vendors at Philadelphia. The attachment clid not, as we have seen, defeat the vendor’s right, to which the goods, being .then in transitu, -were subject. Nor eould the subsequent proceedings under the attachment destroy the right, if asserted before the g'oods were actually sold and dispersed under the order of the Chancellor, and the proceeds appropriated by his decree. A contrary determination would enable any creditor to gain priority by attaching the goods at any stage of their transit; which would be inconsistent, not only with, the conclusion previously stated as to the effect of ail-attachment upon the right of stoppage in transitu, but with the principle on which the right is founded, viz;1 “that it is held to be unreasonable to allow the goods of' a vendor to be appropriated to the payment of other creditors of the vendee who fails before payment and before the goods have actually reached him.”
It seems that some of the goods had been sold, under the order of the Chancellor, before the complainants filed their bill, and perhaps before they made any demand. The sale was made for the benefit of all concerned; and before any appropriation of the proceeds, or any adjudication upon the rights of any of the parties, the complainants asserted their right to the subject. Under these circumstances the conversion of the goods into money should not be considered as effecting: *14 in any degree the relative rights of the claimants; but the proceeds should beheld subject to the same rights* and in the same order, as the goods themselves would have been had they been retained in specie. It was not, the intention, and could not properly be the effect of the sale, any more than of the attachment itself, to displace preexisting rights.
A right of Stoppage in transita may be enforced ill chancery.
Where goods have been attached by a proceeding in chancery , and the ven dor comes to assert his prior right, the goods will not be redelivered to him; he will be restricted to the nrnount due for them, and reasonable expenses; the balance of the net proceeds, theattachynoiit vyill take.
The consignee in whose hands the goods were attached, aud by whom they were ¿old, may retain his charges out of ihe proceeds.
The power of the Chancellor to enforce the right of stoppage in transitu has been admitted by this Court in the case of Ford & Warren vs. Sproule & Co. 2 Marsh. 528, and is we think unquestionable. The right is of equitable origin, and its subsequent recognition and enforcement by courts of law does not, according to the uniform decisions of this Court in similar questions, divest the Court of Chancery of its jurisdiction. But whatever might be thought of the general question of jurisdiction, the goods in relation to which the right is now asserted, being in the custody and under the control of the Chancellor, and a part of them having been sold by his order, before the right was asserted, there seems to have been a peculiar propriety in resorting to the same tribunal for the assertion and enforcement of the right. In doing so, however, the complainants subject themselves to the equitable condition, that the price of the goods with the reasonable expense of prosecuting their claim is all that they are entitled to, especially when they come in conflict with other creditors. To this extent, we have no doubt they are entitled to the proceeds of that portion of the attached goods which was contained in the packages described in their bill, in preference to any other creditor of Judson, and in preference to all other claims upon the goods, except the claim of Bakewell for charges and trouble relating to these pai’ticular goods.
The decree is reversed, and the cause remanded with directions to enter a decree in conformity with this opinion, so far as to give precedence to the claim of IiausQ and Son over that of Anderson and Atterbury in the appropriation of the proceeds of the 26 packages described in the bill. But as neither Judson nor Bakewell prosecutes a writ of error to the decree of Anderson and *15 Atterbury against them, the only effect of this opinion is to change the order in which the sum in the hands of Bakewell, arising from the sale of the attached goods is to be appropriated.
Decree, S/c. A final decree for money, must spc icify the sum— not leave it to be ascertained by a •commissioner. Day should be given to the defendant by which to pay, before a decree absolute, to sell land, to .raise the money. When part only ofa tract of land, held under exe-cutory contract, is sold to satisfy a decree, the decree should provide for completing the title to the resithre.
A sale of land, inscribed by the number of acres, ífc. #e. held to heasalein gross, not by the acre. When a tract of land is sold, upon a conjectural lísfimaíe of the quantity, for a gross sum, and the variance between the estimated iind actual, quantity is not very extraordinary, there can he Jtq relief aft account of excess or deficiency. It is 'difficult, if not impracticable, to fix upon a criterion to decide what yariation should be deemed potto have been within the contemplation of the parties, and therefore ground for relief A surplus of 40 or 50 acres, in a tract '¡of 1 00, would not justify a decree for the value of the surplus.
Jost, but there is the vendor is en^^thevsdue of the sm-plus ex-the^atrer'b °de( ducted, and a decree rendered for -the balance; it ^,011^0 decree; which should alv°ndo?1vom h'is obligation to coa veytfle os an
vendor "'to* produ«e h» .0Vn T/'the purchaser> ls oient ground for a decree for a rescission. Btffl Where the error complained of in this court, is a (failure to decree a rescission on such grounds, if peculiar circumstances appear, sufficient t© account .for the omission, without attributing it to a want of title, this court, reversing the idocree, will direct that time be allowed the vendor toproduce his title.
The reversal of % decree will not aiiect a sale, in all respects resillar, undpr the decree.
The com’r. air-pointed to sell land to satisfy a-decree, is directed to advertise it; his report does hot state that he did so, nor does the record show that there was a ny proof of an ad vertisement, on thehearingoftllé exceptions to the report; held that ‘tile report could hot be. properly confirmed,5 and; as the record should contain every tiángueces Sary to sustain the decrees and orders, the repo -i and sale are Set aside.